[No. B184687. Second Dist., Div. Three. May 9, 2007.]

SEA FOODS COMPANY LIMITED, Plaintiff and Respondent, v.
O.M. FOODS COMPANY, LIMITED, Defendant;
RED CHAMBER CO., Objector and Appellant.

[No. B190151. Second Dist., Div. Three. May 9, 2007.]

RED CHAMBER CO., Plaintiff and Appellant, v.
SEA FOODS COMPANY LIMITED, Defendant and Respondent.

## COUNSEL

Reed Smith, James C. Martin, Margaret M. Grignon; David L. Prince; Jeffer Mangels Butler & Marmaro, Neil C. Erickson and Jessica C. Bromall for Plaintiff and Appellant and for Objector and Appellant.

Loeb & Loeb, Lance N. Jurich and Benjamin R. King for Plaintiff and Respondent and for Defendant and Respondent.

## OPINION

**CROSKEY, J.**—When Asian shrimp exporter O.M. Foods (OM) went bankrupt, Red Chamber Co., a California importer, was in possession of shrimp it had received on consignment from OM. Once Red Chamber had sold the shrimp, three different entities sought the $3.6 million proceeds: (1) Cooperatieve Centrale Raiffeisen-Boerleenbank B.A (Rabobank), a bank which had funded OM's operations, to which OM was in debt; (2) Bank of Asia (B of A), another bank which had funded OM, to which OM was in debt; and (3) Sea Foods Company Limited, OM's parent company to which OM also was in debt. While the two banks sued Red Chamber directly, Sea Foods instead brought suit against OM, and then sought to collect the consignment sale proceeds in Red Chamber's possession by means of a writ of attachment. All three entities were successful in obtaining money from Red Chamber. Red Chamber settled with Rabobank and B of A. After Sea Foods obtained a default judgment against OM, Red Chamber was ordered to pay $3.6 million to Sea Foods pursuant to its writ of attachment. We here consider Red Chamber's appeal of the order directing it to pay $3.6 million to Sea Foods pursuant to the writ of attachment, which was entered on the basis that Red Chamber had refused to comply with the writ in bad faith.

Red Chamber also brought suit against Sea Foods, arguing that the writ of attachment was the culmination of a conspiracy between Sea Foods and others, which had been entered into some years prior with the goal of—by means of fraudulent concealment—inducing Red Chamber to go into business with a financially unstable OM, in order to be able to obtain recovery from Red Chamber for OM-caused losses. Sea Foods, which was a Mauritius

company which conducted no business in California, moved to quash service for lack of personal jurisdiction. Red Chamber argued that Sea Foods' California litigation—in which it sought to collect $3.6 million from Red Chamber—constituted sufficient contacts with California to justify jurisdiction. The trial court disagreed. Red Chamber appeals. We have consolidated the two appeals for the purposes of argument and decision. We reverse the orders in both appeals.

## FACTUAL AND PROCEDURAL BACKGROUND

The entity now known as Sea Foods originally operated under the name of Boulougne Investments Limited. On December 14, 1998, Boulougne entered into an agreement with Merrill Lynch Global Emerging Markets Partners, L.P. (Merrill Lynch Global). The precise nature of the agreement is not clear from the record, as it was reflected in numerous written agreements, only one of which is part of the record on appeal. However, pursuant to the agreement, Boulougne was to change its name and adopt new articles of incorporation.[1] Pursuant to the agreement, Merrill Lynch Global was to have a 45 percent ownership interest in the new entity, Sea Foods. In turn, the ordinary shares of OM were to be held by Sea Foods.[2] Key to the operation of OM was that Merrill Lynch Global was to loan $20 million to Sea Foods, to be further loaned to OM. Interest was charged by Merrill Lynch Global at a rate of 32.5 percent per year, to be paid every six months.[3] Sea Foods did not directly charge OM interest. Instead, it was agreed that Sea Foods "shall procure that" OM declares sufficient dividends to enable Sea Foods to make all necessary interest payments. As agreed, on January 29, 1999, Sea Foods entered into a $20 million loan agreement with OM. Pursuant to this agreement, any default under the Merrill Lynch Global/Sea Foods loan constituted an act of default under the Sea Foods/OM loan. By February 12, 2000, Sea Foods owed Merrill Lynch Global $7 million in interest.[4] It was not paid.

---

[1] For the purposes of the agreement, Boulougne was referred to as "OM Offshore," which may provide some clue as to the role Boulougne, ultimately Sea Foods, was intended to play.

[2] The preferred shares of OM were to be held by OMAC, an entity which was also to own 50 percent of Sea Foods.

[3] The agreement was structured, however, so that the failure to make an interest payment would not constitute an event of default under the loan until the defaulting amount exceeded 35 percent of the loan amount. In other words, Sea Foods could miss one (and possibly two) interest payments without triggering a default.

[4] When Sea Foods brought suit against OM for nonpayment, Sea Foods claimed the February 12, 2000 nonpayment was in the amount of $7 million and referred to this as a "default." As the interest rate was 32.5 percent, not 35 percent, the first year's worth of interest payments would be only $6.5 million, and failure to make those payments would not trigger a default. The additional $500,000 charge is unexplained.

Red Chamber began in 1973 as a family business, and has grown to be one of the largest seafood importers in North America. In April 2000, representatives of Red Chamber met with various individuals from OM and Merrill Lynch Global, in Thailand, and discussed proposed business transactions. Red Chamber would later claim that it was not informed that OM was owned by Sea Foods, nor was it told that OM was capitalized by means of a $20 million loan at a 32.5 percent interest rate, and that OM had already failed to make payments. Red Chamber takes the position that it would not have entered into business with OM had it known any of these facts. It did not know, however, and therefore agreed to import shrimp from OM.

The shrimp was shipped from OM to Red Chamber on consignment.[5] When a shipment of shrimp would arrive, it would be accompanied by several documents, including a notice of arrival, a bill of lading, an invoice, and a bill of exchange. The bill of exchange would request payment, *in a fixed amount*, to be made to OM's bank, either Rabobank or B of A. Each shipment of shrimp would not be released to Red Chamber until Red Chamber had signed the related bill of exchange. However, as the shrimp was transmitted to Red Chamber on consignment, the amount that Red Chamber would ultimately pay for the shrimp could not be determined until after the shrimp was sold. Therefore, although Red Chamber signed bills of exchange obligating it to pay certain amounts in connection with each shipment of shrimp, it would ultimately pay *lesser* amounts, based on the sales price of the shrimp (after deducting its commission and related expenses). According to Red Chamber, when it was first faced with the discrepancy between the amount listed on the bills of exchange and the true amount due for the shrimp, Red Chamber asked "its bank" how to proceed. Following instructions from its own bank—and not Rabobank or B of A—Red Chamber notated the difference on the *notices of arrival*, not the bills of exchange.

Business was conducted between Red Chamber and OM in this manner for some time, a situation that ultimately led to the banks' lawsuits against Red Chamber. Rabobank and B of A, the designated payees on the bills of exchange, assert that they were never made aware that Red Chamber's signature on the bills of exchange was conditioned on its agreement with OM to pay lesser amounts. Whether this is a problem, however, depends on whether the banks were the ultimate payees of the bills of exchange, or were simply acting as collecting agents for OM. The nature of OM's relationship

---

[5] Red Chamber submitted, as an exhibit, a one-page "Memorandum of Understanding," dated September 2001. Red Chamber's witness, Ming Shin Kou, referred to the document as a consignment agreement, and stated, somewhat cryptically, "The Consignment Agreement . . . was made in September 2001 by our Thailand representative. . . . The document was made in or about September 2000, to further confirm the underlying agreements that have been reached more than a year earlier. The first part of the consignment was not done until pursuant to a written agreement." (*Sic.*)

with its banks is an issue of some dispute. It is uncertain whether OM had *assigned to the banks* its right to the amounts to be paid by Red Chamber, or whether the banks were simply issuing the bills of exchange to facilitate OM's collection of the amounts due from Red Chamber *to OM*.

In any event, this course of dealing continued until early 2002 when OM went bankrupt.[6] OM was in debt to both of its banks, as well as owing the initial $20 million (plus interest) to Sea Foods. At the time of its downfall, the only assets OM arguably owned were a seafood production plant in Thailand, $2.5 million in consigned shrimp in Red Chamber's possession, and $1.1 million in consigned shrimp proceeds in Red Chamber's possession. The banks and Sea Foods each went after Red Chamber. In Sea Foods's collection proceeding against Red Chamber, the dispute leading to the current appeal, the trial court ultimately concluded that Red Chamber had acted in bad faith, in that it fought *all* collection efforts, arguing different positions in each one, with the apparent intent of keeping the money for itself. As Red Chamber's response to the collection efforts of each party was determinative of the trial court's ruling below, we discuss the proceedings in some detail.

On April 24, 2002, Sea Foods brought suit in California against OM for breach of the $20 million loan agreement. On April 30, 2002, Sea Foods obtained a writ of attachment on all property of OM. On May 1, 2002, the writ of attachment was served on Red Chamber. Red Chamber was concerned that the writ of attachment prevented it from selling the $2.5 million in shrimp it had received on consignment from OM. On May 1, 2002, Sea Foods wrote a letter confirming that the shrimp could be sold. Sea Foods indicated its intent to "levy upon the proceeds of the sale of [OM's] consigned inventory and not upon the inventory itself." The shrimp was sold. It is agreed that Red Chamber ultimately had in its possession a total of $3.6 million in proceeds from the sale of consigned shrimp.

In June 2002, Rabobank sued Red Chamber in federal court. Rabobank alleged that it had entered into a credit facilities agreement with OM by which it would advance money to OM against bills of exchange that had been executed by purchasers of OM's shrimp (including Red Chamber). Rabobank alleged that it had understood that the shrimp had actually been *sold* to Red Chamber, which had unconditionally signed the bills of exchange agreeing to pay for it. Once Red Chamber had signed a bill of exchange, Rabobank would advance to OM 90 percent of the face value of the bill of exchange, and would then expect to collect the full value of the bill of exchange from

---

[6] OM's bankruptcy filing is apparently in Thailand. There have been no issues raised regarding any sort of bankruptcy stay.

Red Chamber when it came due. Rabobank alleged, however, that in September 2001,[7] OM and Red Chamber agreed to change their relationship from that of seller and buyer to one of consignor and consignee. They did so without telling Rabobank, nor did they inform Rabobank that OM continued to inflate the prices on its invoices. In short, Rabobank alleged that Red Chamber agreed to assist OM in its commission of fraud on Rabobank. Rabobank alleged two causes of action against Red Chamber. First, Rabobank sought damages for Red Chamber's failure to pay *in full* all of the bills of exchange on which Rabobank had only received partial payment, and also those few bills of exchange relating to pending transactions on which Rabobank had not been paid any amounts. The total unpaid amount was calculated at over $4.8 million. Second, Rabobank sought damages, including punitive damages, for Red Chamber's participation in OM's fraud.

Red Chamber's defense to Rabobank's action included many arguments. In its August 2002 answer to Rabobank's complaint, Red Chamber raised as an affirmative defense, "Any monetary award in favor of Rabobank based on the bills of exchange is subject to and/or barred by, in whole or in part, the writ of attachment" entered in favor of Sea Foods. In its May 2003 answer to interrogatories, Red Chamber appeared to acknowledge Rabobank's right to recover the lesser amounts (calculated pursuant to the consignment agreement) on the bills of exchange remaining outstanding; however, Red Chamber also argued that Rabobank had committed fraud,[8] rendering the bills of exchange void and entitling Red Chamber to a full refund of all amounts paid. In September 2003, Red Chamber entered into a settlement agreement with Rabobank, by which it paid Rabobank $2.5 million.[9]

B of A also brought suit against Red Chamber, in federal court. The record on appeal does not include a copy of B of A's complaint; the record contains only *characterizations* of the theories argued in the B of A litigation, and these characterizations are not entirely consistent. What is significant, however, is that, in opposition to B of A's action, Red Chamber argued, *clearly* and *repeatedly*, that B of A was *not an assignee* of the bills of exchange, but had instead acted only as a remitting bank to facilitate OM's collections from Red Chamber. In July 2004, judgment was entered in favor of B of A and

---

[7] This is an apparent reference to the Red Chamber/OM Memorandum of Understanding.

[8] Red Chamber suggested that the bills of exchange submitted by Rabobank "related to shrimp which had been provided to Red Chamber . . . many months before pursuant to different transactions."

[9] Red Chamber would ultimately argue that this was part of a global settlement agreement by which it also bought its peace from Sea Foods. The record does not reflect such a global settlement agreement.

against Red Chamber in the amount of $5.8 million, plus prejudgment interest, on the basis that B of A was a holder in due course of the bills of exchange. Red Chamber appealed the judgment. Ultimately, in 2006, while the appeal was pending, B of A settled with Red Chamber for a payment of $3.8 million.

During this time, on December 3, 2003, Sea Foods obtained a default judgment against OM for $20 million. Discovery was conducted against Red Chamber, and it is undisputed that, at the time of service of Sea Foods's writ of attachment, Red Chamber had possessed $2.5 million in OM shrimp and an additional $1.1 million in proceeds of sale of OM shrimp. However, Red Chamber did not immediately turn the $3.6 million over to Sea Foods. As relevant to this appeal, Red Chamber argued that (1) the shrimp sale *proceeds* were not available for attachment, as those proceeds had been assigned to OM's banks, prior to the issuance of the writ of attachment; and (2) Sea Foods was liable to it for its initial fraud in not disclosing the truth about OM.

Code of Civil Procedure section 708.180 provides a summary procedure by which the trial court may determine the interests in property of the judgment debtor in the hands of a third party. This summary determination, however, may *not* be made if the third party's claim is made in good faith, and other circumstances exist. On January 11, 2005, Sea Foods moved pursuant to this section[10] for an order for delivery of the $3.6 million, on the basis that the $3.6 million constituted OM's property (which Sea Foods could obtain as OM's judgment creditor) and that Red Chamber's arguments were not made in good faith. As to the assertion that the shrimp sale proceeds had been assigned to the banks, Sea Foods argued that Red Chamber could not possibly be taking that position in good faith, as Red Chamber had argued *the direct opposite* in B of A's action against Red Chamber. In short, Sea Foods argued that it was undisputed that the shrimp Red Chamber had received on consignment from OM remained OM's shrimp, and the proceeds were thus OM's proceeds, which Sea Foods was entitled to obtain. It was Sea Foods's position that if Red Chamber were *also* liable to the banks, that was a circumstance due entirely to Red Chamber's own act of unconditionally signing the bills of exchange when it had received nothing in return, not due to any assignment of the shrimp sale proceeds. As to the assertion that Sea Foods was somehow liable to Red Chamber for fraud, Sea Foods noted that there were only bald allegations of some general fraud.

---

[10] This was the wrong section. Code of Civil Procedure section 708.180 governs property of a judgment debtor in the possession of a third party, which is obtained by a judgment creditor by means of a *writ of execution*. Code of Civil Procedure section 491.170 governs property in the possession of a third person which is subject to a *writ of attachment*. The procedures contemplated by the two sections are identical.

As the trial court could not even proceed under Code of Civil Procedure section 708.180 if Red Chamber made its claims in good faith, Red Chamber's motivation became a key issue. The parties filed lengthy briefs on the issue, supported by declarations and documentary evidence—specifically focusing on Red Chamber's position in the B of A litigation. Along with its opposition to the motion, Red Chamber filed a request for continuance for discovery or for a creditor's suit. The request for continuance for discovery was conditional, seeking a continuance, "[t]o the extent that the Court needs additional evidence to make a determination as to the good faith nature of Red Chamber's dispute." "In the alternative," Red Chamber requested that the court refrain from making a determination pursuant to the summary procedure of Code of Civil Procedure section 708.180, and proceed by way of creditor's suit. Red Chamber set forth no basis for this alternative request, but cited to Code of Civil Procedure section 708.180, subdivision (b)(3), the subdivision which provides that the trial court may *not* proceed via summary proceeding if the third person's claim is made in good faith and the court determines that the interests of the parties should be determined in a creditor's suit.

A hearing was held on February 15, 2005. The commissioner presiding over the hearing concluded that the motion had been brought in the wrong department of the superior court, and that it should be brought in the department which had issued the initial writ of attachment. As such, the court denied the motion without prejudice, and made no determinations of fact or law.

At this point, Red Chamber filed a new action against Sea Foods and Merrill Lynch Global, for fraud. We will discuss this action at length below. We note, however, that a separate action was necessary because the summary procedure by which Sea Foods chose to pursue the funds in Red Chamber's possession does not allow for Red Chamber to pursue a cross-complaint. Sea Foods would ultimately prevail in Red Chamber's action, by means of a motion to quash for lack of personal jurisdiction.

Sea Foods returned to the department which had issued the writ of attachment and brought what was, in effect, the same motion to obtain the $3.6 million that it had previously presented. Sea Foods again attempted to bring its motion under Code of Civil Procedure section 708.180, arguing that this statute was somehow incorporated by reference into proceedings on a writ of attachment, overlooking Code of Civil Procedure section 491.170, which provides the identical summary procedure for property in the possession of a third party on a writ of attachment.

Red Chamber filed the same papers in opposition, making the same arguments. In the introductory section of its opposition, in which it briefly set forth its arguments, Red Chamber added, "The request for a determination under Code of Civil Procedure [section] 708.180 is not authorized by statute since [that section] is not an attachment remedy . . . . Regardless of the inapplicability of [section] 708.180, there is a good faith dispute by Red Chamber as to the existence of the indebtedness claimed to be owed." Red Chamber also filed its same request for a continuance for discovery and its alternative request for a creditor's suit.

A hearing on the motion was held on April 28, 2005; the parties agree it was approximately one hour in length. Commissioner Victor Greenberg presided, and heard argument from both counsel on the issues. During the hearing, counsel for Red Chamber argued that the matter should proceed by means of a creditor's suit. At one point, while counsel for Red Chamber was attempting to argue that Red Chamber should receive credit for the settlement to Rabobank[11] the following exchange occurred:

"[Counsel for Red Chamber]: And that's why the summary proceeding is very, very prejudicial to Red Chamber. All of those issues in the terms of discovery, presentation of witnesses, I mean these are very heavy issues that in a summary proceeding on declarations alone are extremely difficult to convey to the court. [¶] We also had requested the court continue or refer this matter to a creditor[']s case because I think that a creditor[']s lawsuit is the ultimate place where this dispute between Sea Foods and Red Chamber belongs.

"The Court: I think that very suit is a possibility, but it can also be done using this method.

"[Counsel for Red Chamber]: I agree, your honor. And I don't dispute with the court but I do take issue with the court on that because the complexity of this transaction, the number of parties involved, the tremendous amount of documentation involved doesn't lend itself to this type of summary proceeding. A creditor[']s suit is the way to go."

A creditor's suit, however, is not necessary when the third party is not acting in good faith, and the trial court was concerned with Red Chamber's alleged good faith. In this proceeding, Red Chamber argued that it could not

---

[11] Red Chamber's theory was that, upon receipt of the settlement funds, Rabobank would credit OM's account in that amount. If Red Chamber were required to pay Sea Foods, it would be a second credit to OM, which would in effect be getting paid twice for the same shrimp.

turn the shrimp proceeds over to Sea Foods because the money was always the banks'; yet, during the B of A lawsuit, Red Chamber had argued that the money was OM's, not the banks'. Concerned that the position taken in the B of A lawsuit was closer in time to the issuance of the writ of attachment, and was therefore Red Chamber's "first position," the court expressed doubts regarding Red Chamber's good faith in denying the writ of attachment.[12]

Near the end of the hearing, Red Chamber's counsel again argued that it was "entitled to a continuance and creditor[']s suit" as there were many disputed issues. The trial court indicated that it would reread Red Chamber's filings in the B of A lawsuit "because ultimately if I find that there wasn't good cause for [Red Chamber] to take that position that may be determinative in and of itself."

The court permitted Red Chamber to file additional documents from the B of A litigation to better illustrate the position it had taken in that case. On May 23, 2005, the trial court issued its ruling, requiring Red Chamber to pay $3.6 million to Sea Foods. The trial court noted that Red Chamber was *now* trying to cast itself in the role of a party attempting to establish the proper recipient of the shrimp proceeds among competing claimants, but that Red Chamber had *previously* argued against each different claimant's right to the funds. The trial court concluded that Red Chamber had acted "in a manner which could potentially have resulted in its unjust enrichment at the expense of the proper entity," and had therefore acted in bad faith. As such, the court concluded that Red Chamber did not act in good faith when it refused to comply with the writ of attachment. As to the determination of the interests in the $3.6 million, the trial court concluded that Red Chamber had "failed to prove [its] contentions regarding the existence and applicability of any offset against [Sea Foods]." Noticeably absent from the trial court's order was any determination that the shrimp sale proceeds *were not* subject to a previous assignment to the banks.

On June 2, 2005, Red Chamber moved for reconsideration, based on additional evidence regarding its position in the banks' actions. In argument on the motion for reconsideration, Red Chamber again argued that this matter should be resolved in a creditor's suit.[13] Finally, Red Chamber argued that, at

---

[12] Red Chamber argued that judicial estoppel was inapplicable because the federal court did not accept its argument in the B of A action. The trial court here was not concerned with judicial estoppel, but Red Chamber's good or bad faith in refusing to comply with the writ of attachment.

[13] Indeed, Red Chamber argued that it was an abuse of discretion to deny Red Chamber discovery or a creditor's suit.

the very least, Sea Foods's recovery must be reduced by the $2.5 million that Red Chamber had paid Rabobank, on the theory that Red Chamber's position with respect to Rabobank never changed, even though its position with respect to B of A might have.

The trial court denied reconsideration, on the basis that Red Chamber did not raise new or different facts entitling it to reconsideration. The court also concluded that, even if it considered Red Chamber's submissions, its ruling would stand.

The court entered a final order requiring Red Chamber to pay the money to Sea Foods. Red Chamber filed a timely notice of appeal. That is the first appeal before us.

On March 18, 2005, Red Chamber brought suit against Sea Foods, Merrill Lynch Global, and Merrill Lynch & Co. asserting fraud in the initial April 2000 meeting in Thailand that induced Red Chamber to enter into business with OM. The operative complaint is the first amended complaint, filed November 14, 2005. It alleges, as against Sea Foods, causes of action for fraudulent misrepresentation, fraudulent concealment, negligent misrepresentation, and civil conspiracy. Red Chamber specifically alleged that the "motive behind [d]efendants' scheme to induce [it] into a business relationship with [OM] was to generate a source of income and expose other assets in . . . California to satisfy repayment of the $28 million owed to [d]efendants by [OM]. Defendants carried out that strategy when Sea Foods filed a lawsuit against [OM] in the Los Angeles County Superior Court. . . . Sea Foods also used [that] action to obtain a writ of attachment that was levied on consigned inventory in the possession of [Red Chamber] worth millions of dollars which caused some portion of the damages for which [Red Chamber] seeks recovery in this action . . . ." As to that action, Red Chamber alleges the "writ of attachment was improperly levied because the proceeds of the sale of that inventory were payable to certain banks, not to [OM]."

On December 14, 2005, Sea Foods filed a motion to quash service, arguing there was no basis for jurisdiction over it. Specifically, it asserted that there was no basis for general jurisdiction, a contention with which Red Chamber does not argue. It also argued there was no basis for specific jurisdiction, in that its sole contact with California was its prosecution of its action against OM (and related collection proceedings against Red Chamber), which *post-dated* by some two years the alleged fraudulent conduct committed in Thailand in April 2000. Red Chamber opposed the motion, arguing that Sea Foods's lawsuit was a sufficient basis for California to exercise jurisdiction over it. The trial court agreed with Sea Foods and granted the motion to quash. Red Chamber filed a timely notice of appeal. That is the second appeal before us.

## ISSUES ON APPEAL

In the first appeal, we consider whether the trial court erred in concluding Red Chamber denied the writ of attachment in bad faith. Concluding that substantial evidence does not support that finding, we hold that the summary proceeding was not a proper procedure for determining Red Chamber's liability to Sea Foods, and we will remand to enable Sea Foods to bring a creditor's suit. In the second appeal, we consider whether Sea Foods's action against OM and collection efforts against Red Chamber create an implied consent to California jurisdiction for Red Chamber's action against it. Concluding that they do, we will reverse the trial court's order granting the motion to quash.

## DISCUSSION

### 1. The Summary Process for Collecting Debts in the Possession of Third Parties Is Not Applicable

To better understand the summary process envisioned by Code of Civil Procedure sections 708.180 and 491.170, it is necessary to consider their history. Preliminarily, we note that Code of Civil Procedure section 491.170, which sets forth the summary process in the context of a writ of attachment, is "drawn from" Code of Civil Procedure section 708.180, the virtually identical section in the context of writs of execution. (Cal. Law Revision Com. com., 15A West's Ann. Code Civ. Proc. (2006 supp.) foll. § 491.170, p. 142.) We therefore focus on the evolution of Code of Civil Procedure section 708.180.

Code of Civil Procedure section 708.180 replaces Code of Civil Procedure former section 719. That section provided, in pertinent part, "The judge or referee may order any property of the judgment debtor, not exempt from execution, in the hands of . . . any other person, or due to the judgment debtor, to be applied toward the satisfaction of the judgment; but no such order can be made as to money or property in the hands of any other person or claimed to be due from him to the judgment debtor, if such person claims an interest in the property adverse to the judgment debtor or denies the debt." In other words, "once the third person asserted an interest in the property adverse to the judgment creditor or denied owing any property to the judgment debtor, the trial court was powerless to act under that statute with respect to the disputed property, and a judgment creditor intent on collecting sums allegedly owed to the judgment debtor by a third person was limited to proceeding against the third person via a creditor's suit." (*Evans v. Paye* (1995) 32 Cal.App.4th 265, 278 [37 Cal.Rptr.2d 915].)

"[C]ourts struggled with how to give relief to a judgment creditor under the statute when it appeared the third person's claim had been made in bad faith . . . ." (*Evans v. Paye, supra*, 32 Cal.App.4th at p. 278.) Ultimately, in *Thomas v. Thomas* (1961) 192 Cal.App.2d 771 [13 Cal.Rptr. 872], Division One of the Second Appellate District engrafted a "good faith" exception onto the statute. The court concluded that if the third person denied the debt in good faith, the summary procedure could not be used and the judgment creditor had to proceed by means of a creditor's suit. (*Id.* at p. 776.) The court concluded that "[u]nless it must be said that [the third party]'s claims are frivolous and a mere sham," the summary proceedings must be terminated and the judgment creditor left to pursue a creditor's suit. (*Id.* at p. 777.)

In 1982, the Legislature enacted Code of Civil Procedure section 708.180. Subdivision (a) of that section provides that, if a third person claims an interest in the property adverse to the judgment debtor or denies the debt, "the court may, if the judgment creditor so requests, determine the interests in the property or the existence of the debt." However, subdivision (b) provides, "The court may not make the determination provided in subdivision (a) if the third person's claim is made in good faith and [one of several] conditions is satisfied . . . ." The Legislative Committee comment to Code of Civil Procedure section 708.180 explains that the good faith requirement of subdivision (b) is a codification of the rule of *Thomas v. Thomas, supra*, 192 Cal.App.2d at page 776. (Legis. Com. com., 17 West's Ann. Code Civ. Proc. (1987 ed.) foll. § 708.180, p. 453.) In short, the purpose of the statute is "to preclude a third person who has acted in bad faith from delaying the matter by compelling the judgment creditor to resort to a creditor's suit to determine the existence of the debt." (*Evans v. Paye, supra*, 32 Cal.App.4th at p. 282.)

The third party claiming an interest in the property or denying the debt has the burden of proving, by a preponderance of the evidence, that the claim is made in good faith. (*Evans v. Paye, supra*, 32 Cal.App.4th at p. 270.) "Evidence that the third person's denial of a debt owing to the judgment debtor is made in good faith can take many forms. For example, good faith could be shown by evidence that the third person genuinely believed the debt never existed or, if there was a debt, by evidence of the third person's sincere belief that the obligation to the judgment debtor was dependent on a condition yet unfulfilled; that payment on the debt had been excused by the occurrence of some event subsequent to the obligation or by the judgment debtor's failure to perform; that the obligation was incurred through mistake or fraud; that an honest dispute exists as to the amount of the debt; or that the debt already had been satisfied, in whole or in part." (*Id.* at p. 283.)

We turn to the facts of this case. Red Chamber refused to turn the $3.6 million in shrimp sale proceeds over to Sea Foods on the theory that the right

to receive that money belonged to Rabobank and/or B of A, not OM. The trial court concluded that Red Chamber made this claim in bad faith, relying on evidence that Red Chamber had previously defended against B of A's lawsuit by asserting the shrimp sale proceeds had belonged to OM, not B of A. This litigation strategy, had it been successful, may have subjected Red Chamber to claims of judicial estoppel. It does not, however, constitute bad faith.

The following facts are undisputed: (1) Whenever OM shipped shrimp to Red Chamber, that shrimp was accompanied by a bill of exchange payable to Rabobank or B of A; (2) Red Chamber could not take possession of the shrimp without signing the bills of exchange; (3) Red Chamber, in fact, signed the bills of exchange; (4) Red Chamber made partial payments on the bills of exchange; (5) by the time of the hearing on whether Red Chamber had failed to comply with the writ of attachment in good faith, B of A had obtained a $5.8 million judgment against Red Chamber, on the basis of the bills of exchange; and (6) by the time of the hearing on whether Red Chamber had failed to comply with the writ of attachment in good faith, Rabobank had obtained a $2.5 million settlement from Red Chamber, in connection with its claims arising out of the bills of exchange. Under these circumstances, it is clear that Red Chamber's denial of the writ of attachment was neither frivolous nor a sham. Red Chamber certainly possessed a good faith belief that, due to the transactions by which it obtained possession of the shrimp by signing the bills of exchange, the banks, and not OM, were entitled to payment of the proceeds of the sale of the shrimp. The fact that, at the time of the good faith determination, the court in the B of A case had concluded that B of A was, in fact, entitled to payment, proves that Red Chamber's contention was not baseless.

Sea Foods makes much of the evidence that Red Chamber obtained the shrimp from OM *on consignment*, and further argues that there is an absence of evidence that the right to collect the shrimp proceeds was *assigned* to the banks. These are surely factors to be considered in determining whether Red Chamber is ultimately liable to Sea Foods on the writ of attachment. However, the issue before us is Red Chamber's good faith in denying the writ of attachment. At the time it was served with the writ of attachment, Red Chamber had already signed bills of exchange which, on their face, obligated Red Chamber to remit the shrimp sale proceeds to the banks. While the exact nature of the web of transactions between OM, Red Chamber and the banks remains unclear, it is apparent that Red Chamber had a good faith belief that the shrimp and shrimp proceeds in its possession were not owned by OM, and therefore not subject to the writ of attachment. As such, we conclude substantial evidence does not support the trial court's determination that Red Chamber's failure to comply with the writ of attachment was in bad faith.

■ We next consider whether one of the circumstances exists that, coupled with Red Chamber's showing of good faith, prohibits the trial court from proceeding summarily and mandates Sea Foods proceed by means of a creditor's suit. Undeniably, one such circumstance exists. The summary process is inappropriate if the third party denies the debt in good faith and "[t]he court determines that the interests in the property or the existence of the debt should be determined in a creditor's suit." (Code Civ. Proc., § 491.170, subd. (b)(3).) This is clearly such a case. In the instant case, the court's summary process consisted of a one-hour argument.[14] Numerous issues surround the determination of the interests in the $3.6 million in shrimp proceeds. In particular, the court must determine the legal effect of the transaction by which Red Chamber obtained possession of the shrimp by signing bills of exchange in favor of the banks. Was this a consignment or a sale of shrimp? Were the bills of exchange an assignment of OM's right to the funds to the banks or simply a means of collection for OM? Did Red Chamber's act of signing the bills of exchange create an obligation to pay the banks that was wholly unrelated to the shrimp, or was Red Chamber's obligation to pay determined by its sale of the shrimp? Additionally, Red Chamber has now settled its disputes with both Rabobank and B of A. It must be determined whether, and to what extent, Red Chamber should be given a credit against any obligation to OM (and, through it, Sea Foods) for the amounts it paid Rabobank and B of A. This would involve complex accounting issues wholly unsuited to the summary process contemplated by Code of Civil Procedure section 491.170.

■ In sum, we conclude that the trial court erred in holding Red Chamber's refusal to comply with the writ of attachment was in bad faith. We further conclude that the determination of the interests in the property at issue are inappropriate for the summary process and should instead be determined in a creditor's suit. We will therefore reverse the order requiring Red Chamber to pay the shrimp proceeds to Sea Foods, and remand for further proceedings.

### 2. *Sea Foods Consented to the Jurisdiction of the California Courts*

On an appeal from an order quashing service of a summons, where there is no conflict in the evidence, the question of jurisdiction is purely one of the law and the reviewing court engages in an independent review of the record. (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 449 [58 Cal.Rptr.2d 899, 926 P.2d 1085].)

---

[14] In *Evans v. Paye, supra*, 32 Cal.App.4th 265, 273, footnote 6, the summary procedure consisted of a two-day court trial with oral testimony.

■ "California's long-arm statute authorizes California courts to exercise jurisdiction on any basis not inconsistent with the Constitution of the United States or the Constitution of California." (*Vons Companies, Inc. v. Seabest Foods, Inc., supra*, 14 Cal.4th at p. 444.) "A state may exercise jurisdiction over an individual on a number of bases, including consent . . . . [Citations.] Consent is considered as one of four traditional bases for the exercise of personal jurisdiction over a nonresident defendant." (*Nobel Farms, Inc. v. Pasero* (2003) 106 Cal.App.4th 654, 658 [130 Cal.Rptr.2d 881].) Consent may be implied by a party's conduct. (*Ibid.*)

■ Specifically, when a party has availed itself of the courts of California, that party is held to have impliedly consented to jurisdiction in any action related to the action it brought. "[E]ven at common law if the nonresident initiated a judicial action in California, and was involved in a subsequent action directly relating to the first, jurisdiction was proper." (*Professional Travel, Inc. v. Kalish & Rice, Inc.* (1988) 199 Cal.App.3d 762, 766 [245 Cal.Rptr. 159].) "The United States Supreme Court has . . . long recognized that when a nonresident plaintiff commences an action, he submits to the court's personal jurisdiction on any cross-complaint filed against him by the defendant. [Citation.] By choosing a particular forum, [the] plaintiff is considered to have voluntarily submitted to the court's jurisdiction 'for all purposes for which justice to the defendant requires his presence.' [Citations.] . . . This 'is the price which the state may exact as the condition of opening its courts to the plaintiff.' " (*Nobel Farms, Inc. v. Pasero, supra*, 106 Cal.App.4th at pp. 658–659; see also *In re Marriage of Aron* (1990) 224 Cal.App.3d 1086, 1095 [274 Cal.Rptr. 357].) Similarly, a nonresident plaintiff who has filed a suit in California against particular parties "has consented to jurisdiction in California when these same parties later sue him in a related action." (*Nobel Farms, Inc. v. Pasero, supra*, 106 Cal.App.4th at p. 659.)

Sea Foods first invoked the jurisdiction of California courts when it brought suit against OM. Sea Foods then availed itself of California's collection procedures, by serving a writ of attachment on Red Chamber. As Sea Foods subsequently obtained a default judgment against OM, Sea Foods then attempted to collect from Red Chamber. While Sea Foods characterizes its suit as an action against OM for breach of the $20 million loan agreement, we note that, since OM was Sea Foods's bankrupt subsidiary, it is apparent that the sole purpose of Sea Foods's action against OM was to enable it to collect against the shrimp (and shrimp proceeds) in Red Chamber's possession in California.

Red Chamber now seeks to sue Sea Foods in California for fraudulently inducing it to enter into the shrimp importing business with OM in the first place, and charges that the collection proceedings were a culmination of the

fraudulent scheme. Red Chamber's action is undoubtedly related to Sea Foods's attempt to collect against it. Indeed, Red Chamber asserted as a defense in the collection proceedings the very fraud for which it now seeks to sue Sea Foods. Both actions arise from Red Chamber's agreement to import shrimp from OM—Sea Foods sought to collect money due from Red Chamber to OM under that agreement; Red Chamber seeks to recover for the fraud which allegedly induced that agreement.[15] As the two cases are clearly related, Sea Foods's act of bringing the first action acts as a consent to the jurisdiction of California courts over the second.[16]

Indeed, we note the following. Sea Foods proceeded against Red Chamber by means of a summary proceeding which did not allow for the filing of cross-complaints. Had Sea Foods proceeded by means of a creditor's suit, Red Chamber would have been permitted to pursue its fraud claim by means of a cross-complaint, over which the California courts would have indisputably had jurisdiction. That Sea Foods attempted to proceed by means of a summary procedure that does not allow cross-complaints does not afford Sea Foods a basis to challenge California's jurisdiction when Red Chamber was forced to bring a separate action.[17]

---

[15] We also note that Sea Foods sued OM in California for defaulting on a loan agreement. Red Chamber seeks to sue Sea Foods for failing disclose to it both the loan and the default.

[16] Sea Foods contends that, by failing to raise the argument before the trial court, Red Chamber has forfeited the argument that Sea Foods consented to California's jurisdiction by means of its earlier action. The application of the forfeiture rule is not automatic; appellate courts have discretion to excuse such forfeiture. (*In re S.B.* (2004) 32 Cal.4th 1287 [13 Cal.Rptr.3d 786, 90 P.3d 746].) Parties have been permitted to raise new issues on appeal where the issue is purely a question of law on undisputed facts. (*Frink v. Prod* (1982) 31 Cal.3d 166, 170 [181 Cal.Rptr. 893, 643 P.2d 476].) This is an appropriate case for the exercise of such discretion. Although Red Chamber did not specifically argue that Sea Foods had *consented* to jurisdiction by means of the prior action, Red Chamber certainly argued that the legal effect of the prior action was to give California courts jurisdiction over Red Chamber's action. The issue of consent to jurisdiction is a pure issue of law that can be resolved on undisputed facts, and Sea Foods was given an opportunity to brief the issue on appeal.

[17] Sea Foods also suggests that there is some significance to the fact that Red Chamber is suing it for conduct that occurred in 2000, yet Sea Foods had not invoked the jurisdiction of California courts until 2002. Sea Foods takes the position that, in determining whether it had sufficient minimum contacts with California to justify jurisdiction in Red Chamber's action, we must consider only the contacts that existed at the time of the events that gave rise to Red Chamber's action, not the lawsuit that came after. Our decision is based on Sea Foods's *consent* to jurisdiction, not its contacts with California. When Sea Foods brought suit in California, Sea Foods voluntarily submitted to California courts' jurisdiction in any related action. That the facts underlying such a related action predated Sea Foods's invocation of the California courts only reinforces the conclusion. At the time Sea Foods brought its suit in California, it was aware that Red Chamber might bring suit against it for fraudulent inducement of the 2000 agreement, and it nonetheless voluntarily submitted to the jurisdiction of California courts for any related action that might be brought against it.

### *DISPOSITION*

In B184687, the order requiring Red Chamber to pay Sea Foods the $3.6 million in shrimp sale proceeds plus interest is reversed. In B190151, the order quashing service of process is reversed. In both cases, the matter is remanded for further proceedings consistent with this opinion. Red Chamber shall recover its costs in both appeals.

Klein, P. J., and Aldrich, J., concurred.

On May 23, 2007, the opinion was modified to read as printed above.